The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below.



Russ Kendig
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | CHAPTER 7 |
| | ) | |
| MONROE L. BEACHY, | ) | CASE NO. 10-62857 |
| | ) | |
| | ) | JUDGE RUSS KENDIG |
| Debtor. | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | |

On October 28, 2010, debtor Monroe L. Beachy ("debtor") filed a motion to dismiss this case. On January 18, 2011, a hearing was held on the motion. After the closing of testimony, the court announced and then entered a scheduling order allowing the parties to file additional briefs and providing that the court would decide the matter without further notice or hearing. Briefs have been filed and this is the court's decision.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

On June 30, 2010, debtor filed for bankruptcy pursuant to chapter 7 of title 11 United States Code. On September 9, 2010, the United States Trustee ("UST") filed a complaint objecting to debtor's discharge. According to the complaint, debtor operated as an unlicensed,

unincorporated dealer of securities doing business under the name "A&M Investments." Debtor solicited funds from investors and invested those funds in assets including personal loans, mutual funds, stocks, bonds, margin accounts and certificates of deposit.

According to the complaint, debtor became insolvent around the year 2000. Thereafter, the complaint alleges that the debtor operated A&M Investments as a Ponzi scheme. Despite his deepening insolvency, debtor continued to solicit funds from new investors and paid earlier investors with new investor money. By the time debtor filed his bankruptcy petition, he owed investors approximately thirty three million dollars and had approximately eighteen million dollars in assets. Debtor's assets are now property of the estate and are held by chapter 7 panel trustee Anne Piero Silagy ("trustee"). On October 13, 2010, debtor settled the UST's complaint by waiving his opportunity to receive a discharge.

Debtor's activities also drew the attention of the Securities and Exchange Commission ("SEC"), which has been an active participant in this case. On February 15, 2011, the SEC filed a complaint against the debtor in the United States District Court for the Northern District of Ohio to initiate case 5:2011-cv-00320. The complaint alleges multiple violations of the Securities and Exchange Acts. On February 15, 2011, the debtor consented to the entry of judgment against himself, which was entered on February 18, 2011.

According to the motion to dismiss, debtor is Amish and the vast majority of investors are members of the Amish, Mennonite or associated communities (hereinafter "the Plain Community"). (Mot. at 2). As a result of the filing, an entity known as the A&M Trustee Committee ("Committee") was formed for the purpose of creating a Plain Community alternative to this bankruptcy proceeding ("Alternative Plan"). Id. According to an organizational flowchart filed by the Committee and attached as Exhibit A, the Committee is directly supervised by the New Order Amish Bishop Committee ("Bishop Committee"), which, in turn, is a component of the Amish Church.

The Committee characterizes the "Plain Community and/or Amish" creditors as a single group united in support of the debtor's motion to dismiss. (Mem. in Supp. at 7). The Committee also refers to "the Amish Church" as a monolithic entity (Mem. at 11). These characterizations are problematic. There is no such thing as "the Amish Church" unlike more connectional churches such as the Presbyterian Church (U.S.A.) or the United Methodist Church. Instead, local communities form groups of worshipers. Within regions, groups have bishops that coordinate activities to some extent. *See* John A. Hostetler, Amish Society 12–15 (4th ed. 1993). Use of the term "Mennonite" (to lump into "Plain Community") for a widely divergent group of connectional and non-connectional churches with extremely contrary practices is also problematic. Nonetheless, the court can resolve the debtor's motion without examining these definitions and characterizations, which underpin the Committee's arguments. Accordingly, for the purposes of this motion, and with the world's largest grain of salt, the court adopts the Committee's self-references to the Plain Community, the Amish and the Amish Church as unitary entities.

2

On October 28, 2010, the debtor filed a motion to dismiss this case conditioned on the court endorsing the Alternative Plan. The Committee filed a memorandum in support of the motion. In addition, the Committee assembled letters of support from approximately 2,316 Plain Community creditors in support of the motion and filed them with the court. A sample letter of support is attached as Exhibit B to this opinion. The UST, SEC, and the trustee (collectively "Respondents") filed objections to the motion. At the evidentiary hearing on the motion, Robert S. Thomas and Michelle DiBartolo represented the Committee, Sherri Lynn Dahl represented the debtor, Bruce R. Schrader, II represented the trustee, and Maria Giannirakis represented the UST. The SEC did not appear. The Committee called three witnesses, and no other witnesses were called.

The first witness was Emery E. Miller. Mr. Miller serves as a member of the Committee and as the office administrator. In his capacity as office administrator, he collected letters of support from Plain Community members in favor of dismissal. In addition to letters of support, he testified that he also collected "Standstill Agreements," a sample of which is attached to this opinion as Exhibit C. He testified that approximately 1,894 Plain Community creditors returned signed Standstill Agreements.

The second witness was Jacob J. Beachy.[1] Mr. Beachy testified that he is a bishop and a member of the Bishop Committee. Mr. Beachy testified that, after discussions with Plain Community members, the Bishop Committee voted unanimously to seek the dismissal of this bankruptcy. He explained that Plain Community members view Biblical scripture as forbidding the use of courts to resolve financial disputes. He testified that the Bible forbids the use of force and that the filing of this case amounts to a use of force by the debtor against his creditors, most of whom are also Plain Community members. He also explained that the public spectacle of bankruptcy pollutes Amish testimony to the outside world.

The third witness was Wayne H. Wengerd. Mr. Wengerd is the owner of a farm equipment manufacturing business and the Chair of the Committee. Like Mr. Beachy, he testified that the Amish religion forbids use of the court system. He also discussed the qualifications of Amish entities to administer this insolvency proceeding. He explained that similar groups had handled two other multimillion dollar insolvency proceedings, one with twenty million dollars in liabilities and ten million dollars in assets and another with one hundred million dollars in liabilities and thirty five million dollars in assets. He explained that the individuals who administered these proceedings were highly qualified. He gave the examples of one individual who had thirty years of experience as a bank branch manager and another who was general manager of a business which grosses three hundred million dollars in sales per year.

In addition, he gave some detail regarding the Alternative Plan, although the Alternative Plan was only in preliminary form as of the hearing date. He explained that the Alternative Plan

---

[1] There is a high degree of commonality in many Amish surnames. There was no testimony that Jacob J. Beachy is closely related to the debtor.

3

would be superior in at least three ways to bankruptcy. First, the entire cost of administering the estate would be paid by sources other than the estate, which would result in a higher return for creditors. Second, the Amish Church would raise "benevolent funds," which the Committee would distribute at its discretion to the neediest creditors. Third, he explained that under the Alternative Plan the debtor would surrender exempt and post-petition property, further increasing distributions to creditors.

Mr. Wegnerd also discussed two perceived weaknesses in the Alternative Plan. First, he addressed the inability of the Committee to avoid preferences and fraudulent transfers. The trustee has filed a complaint to avoid an alleged fraudulent transfer from the debtor to an entity known as the Amish Helping Fund and is looking into the possibility of other fraudulent transfers. Mr. Wengerd explained that the Committee has negotiated a one million dollar settlement with the Amish Helping Fund contingent on the dismissal of this case. He argued that this settlement was greater than what could be recovered by the trustee through litigation. Second, he addressed the absence of an automatic stay. He explained that if a creditor initiated a lawsuit against the debtor, the Committee would attempt to reach a settlement with that creditor outside of the judicial process.

The Committee's post-hearing brief provides a copy of the Alternative Plan in its final form, attached to this opinion as Exhibit D. The Alternative Plan proposes to establish a trust at Commercial & Savings Bank of Millersburg, Ohio. Upon dismissal, the court would order any and all funds currently held by the trustee to be paid as follows: first, to the court for any outstanding costs; second, to the trustee in compensation for administering the bankruptcy estate through the date of dismissal and, third, to the trust. Debtor's exempt and post-petition property would also be deposited into the trust. The additional benevolent funds raised by the Amish Church would be held in a separate account.

To file a claim for funds deposited in the trust, creditors would be required to provide the bank with documentation indicating the balance owed and how the balance was determined. Claims filed in this bankruptcy case would be allowed automatically. In the event that a claim is disputed, Troyer & Associates, an accounting firm in Sugarcreek, Ohio, would review the basis for the claim. If the dispute persisted, the Committee's Creditor Subcommittee would rule on the allowability of the claim. Allowed claims would be paid on a pro rata basis.

The Committee would establish a separate claims process for the benevolent funds raised by the Amish Church. The Committee would set a deadline for both Plain and non-Plain creditors to apply for benevolent funds. Distribution of benevolent funds would be based on need. However, the determination of need would be at the sole discretion of the Amish Church and its committees.

4

# ARGUMENTS

The debtor and the Committee argue that this case must be dismissed pursuant to the Free Exercise Clause of the United States Constitution. In the alternative, they argue that the court must dismiss this case pursuant to The Religious Freedom Restoration Act of 1993 ("RFRA"). 42 U.S.C. §§ 2000bb, *et seq.* In the further alternative, they argue that this case must be dismissed for cause pursuant to 11 U.S.C. § 707(a). Respondents argue that the court cannot dismiss this case consistent with the Establishment Clause of the United States Constitution, that RFRA is not availing and that no cause exists to dismiss this case.

# LAW AND ANALYSIS

*A. First Amendment Arguments*

"The Religion Clauses of the First Amendment provide: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise of.'" Cutter v. Wilkinson, 544 U.S. 709, 719 (2005) (citations omitted). The first of the two clauses, commonly called the Establishment Clause, commands a separation of church and state. Id. The second clause, commonly called the Free Exercise Clause, commands the government not to interfere with the religious practices of private individuals. Id.

The rights protected by the Religion Clauses are frequently in tension. Locke v. Davey, 540 U.S. 712, 718 (2004) (citations omitted); Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 334–35 (1987). Such legal tension is obvious in the present matter. The Committee argues that the case must be dismissed pursuant to the Free Exercise Clause because the Plain Community holds a sincere religious belief that this bankruptcy proceeding is contrary to Biblical principles. Respondents, on the other hand, argue that delegating insolvency proceedings to a religious body would violate the Establishment Clause. For the reasons that follow, the court agrees with the Respondents.

### 1. Dismissal of this Case is Not Compelled by the Free Exercise Clause.

Prior to Employment Division v. Smith, 494 U.S. 872 (1990), the Supreme Court applied a balancing test in Free Exercise Clause cases. The balancing test required courts to ask whether the government action substantially burdened a religious practice, and if it did, whether the burden was justified by a compelling government interest. City of Boerne v. Flores, 521 U.S. 507, 513 (1997) (citing Sherbert v. Verner, 374 U.S. 398 (1963)).

Smith marked a change in Free Exercise Clause jurisprudence. In Smith, the Supreme Court held that "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling government interest." Flores, 521 U.S. at 514; Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993). In this case, the Committee does not and could not argue that the bankruptcy code is anything but a neutral,

5

generally applicable law. Accordingly, the Free Exercise Clause does not compel dismissal of this case.

### 2. The Motion to Dismiss Cannot be Granted Consistent with the Establishment Clause.

In <u>Everson v. Board of Education</u>, 330 U.S. 1, 16 (1947), the Supreme Court described the core values protected by the Establishment Clause:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.

Since <u>Everson</u> was decided, the Supreme Court has refined these principles by introducing a three-prong test for determining whether government action violates the Establishment Clause. A government action that touches on religion must (1) have a secular purpose, (2) not advance or inhibit religion in its primary effect, and (3) not foster excessive government entanglement with religion. <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612–13 (1971).

In <u>Larkin v. Grendel's Den, Inc.</u>, 459 U.S. 116 (1982), the Supreme Court applied the <u>Lemon</u> test to a state statute that delegated government functions to a religious body and found the delegation unconstitutional under the Establishment Clause. <u>Larkin</u>, 459 U.S. at 127. The Supreme Court has since cited <u>Larkin</u> for the proposition that "the government . . . may not delegate power to a religious institution." <u>Cnty. of Allegheny v. ACLU</u>, 492 U.S. 573, 590–91 (1989) (citations omitted).

In <u>Larkin</u>, the state statute provided that "[p]remises . . . located within a radius of five hundred feet of a church or school shall not be licensed for the sale of alcoholic beverages if the governing body of such church or school files written objection thereto." <u>Larkin</u>, 459 U.S. at 117. A restaurant owner applied for a liquor license, which was denied by the state because a nearby church objected. <u>Id.</u> at 118. The restaurant owner filed suit alleging that the statute violated the Establishment Clause. <u>Id.</u>

The Supreme Court found the statute unconstitutional based on the second and third

6

prongs of the Lemon test. Regarding the second prong, the Court found that the statute impermissibly advanced religion because there was no guarantee that churches would use their power to deny liquor licenses in a religiously neutral way. Id. at 125–26. In addition, the Court found that the transfer of power from a government body to a religious body impermissibly endorsed religion. "The mere appearance of a joint exercise of legislative authority by Church and State provides a significant symbolic benefit to religion in the minds of some by reason of the power conferred." Id.

Regarding the third prong, the Court found that the delegation fostered excessive entanglement between religion and the state by virtue of vesting significant government authority in a religious body. The Court stated that "[u]nder our system [of government] the choice has been made that government is to be entirely excluded from the area of religious instruction and churches excluded from the affairs of government." Id. at 126 (citing Lemon, 403 U.S. at 625) (emphasis deleted). Importantly, none of the Court's reasoning depended on the specific facts of the case. Rather, the Court took the position that delegation to a religious body enmeshes churches in the process of government and "creates the danger of political fragmentation along religious lines . . . ." Id. at 127 (citations and quotations omitted).

The debtor in this case is clearly asking this court to delegate its function to a religious body. The motion to dismiss is conditioned on the court transferring estate funds to the Committee, which, according to the Committee's own filings, is a unit established by a church. Furthermore, the Alternative Plan vests the Committee with judicial powers. For example, the Committee would have the power to determine the allowability of claims, which is a core power of this court. 28 U.S.C. § 157(b)(2)(B). Any such delegation is forbidden by the Establishment Clause, regardless of the specific facts of a particular case.

In the alternative, an independent application of the Lemon test demonstrates that the court cannot dismiss this case consistent with the Establishment Clause. Regarding the first prong, the Committee admits that the motion to dismiss has a religious motive. Regarding the second prong, dismissing this case would serve as an endorsement of the Amish faith, not only to the public at large, but also to non-Amish creditors who would be forced to appear before the Committee to vindicate their rights. Regarding the third prong, investing a religious tribunal with judicial powers impermissibly entangles religion with government affairs.

### B. Arguments Based on the Religious Freedom Restoration Act

Congress passed RFRA in direct response to the Supreme Court's decision in Smith. Flores, 521 U.S. at 512. The intent of RFRA was to reinstate the compelling interest test that the Supreme Court used in Sherbert. Id. at 515. RFRA prohibits government from "substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate that the burden (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Id. at 515–16 (citing 42 U.S.C. § 2000bb-1).

The Committee argues that RFRA requires dismissal of this case. The court rejects the Committee's argument for two reasons. First, RFRA is unconstitutional as applied. Second, RFRA is not availing because the government's interest is both compelling and narrowly tailored.

### 1. RFRA is Unconsititutional as Applied.

For the reasons discussed above, even assuming the prerequisites of RFRA are met, RFRA is unconstitutional as applied under the Establishment Clause. Even though RFRA was enacted in response to the Supreme Court's interpretation of the First Amendment, it is still a statute. The Constitution of the United States is the supreme law of the land, and any unconstitutional law is unenforceable. Marbury v. Madison, 1 Cranch 137, 176–78 (U.S. 1803).

In addition, RFRA may be unconstitutional on its face. In Flores, the City of Boerne refused to issue a construction permit to a Catholic Archbishop because a church building was within an area designated as a historic district. Flores, 521 U.S. at 512. The Archbishop sued the city and invoked RFRA. Id. The Supreme Court concluded that RFRA exceeded Congress's ability to pass remedial legislation under Section 5 of the Fourteenth Amendment and was thus unconstitutional as applied to the states. Id. at 529–35. In addition, the opinion in Flores suggested that Congress's attempt to rewrite a constitutional standard was unconstitutional under the separation of powers doctrine. The Court stated

> Our national experience teaches that the Constitution is preserved best when each part of the Government respects both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. Marbury v. Madison, 1 Cranch, at 177, 2 L.Ed. 60. When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis*, and contrary expectations must be disappointed. RFRA was designed to control cases and controversies, such as the one before us; but as the provisions of the federal statute here invoked are beyond congressional authority, it is this Court's precedent, not RFRA, which must control.

Id. at 535–36. Since Flores was decided, courts have disagreed whether the Supreme Court held RFRA to be unconstitutional as to federal law. *Compare* In re Tessier, 190 B.R. 396 (Bankr. D. Mont. 1995) (RFRA facially unconstitutional) *with* Christians v. Crystal Evangelical Free Church (In re Young), 141 F.3d 854 (8th Cir. 1998) (RFRA constitutional as to federal law). The court need not address this issue, in light of other findings.

## 2. The Government Interests in the Bankruptcy System are Compelling.

In the alternative, even if RFRA reinstates the law pre-Smith, the court finds that the government's interest in an orderly and predictable bankruptcy system is compelling and that this proceeding is a narrowly tailored means of achieving the government's interest.

Courts are split regarding whether the government's interests in bankruptcy are compelling under RFRA. The Eighth Circuit Court of Appeals has found that bankruptcy interests are not compelling, at least as applied to fraudulent transfers. Christians v. Crystal Evangelical Free Church (In re Young), 82 F.3d 1408, 1419–20 (8th Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997), *remanded and reaff'd*, 141 F.3d 854 (8th Cir. 1998). In Young, a chapter 7 panel trustee attempted to recover tithes from the debtor's church. In defense, the church argued that the tithes were protected by RFRA. The court agreed with the church on the basis that compelling governmental interests are "interests of the first order" such as "direct national security and public safety concerns." Id.

On the other hand, in Magic Valley Evangelical Free Church, Inc. v. Fitzgerald (In re Hodge), 220 B.R. 386 (D. Idaho 1998), the court recognized bankruptcy interests as compelling. In doing so, the court focused on the importance of bankruptcy to the nation's economic system:

> The flow of consumer credit, the very lifeblood of the national economy, would almost certainly be constricted by the absence of a bankruptcy system comparable to that established by the Bankruptcy Code. Our nation's economic welfare undeniably has come to depend upon ordinary consumers making purchases on credit that are unsecured by collateral. For these reasons, the federal government's interest in maintaining the bankruptcy system is one of the highest order and must, therefore, be regarded as compelling.

Hodge, 220 B.R. at 392. This court agrees with the Hodge court that a predictable bankruptcy system is essential to maintaining the nation's system of credit.

Furthermore, the Hodge court's conclusion is supported by pre-Smith Free Exercise Clause cases that found other economic interests to be compelling. The Supreme Court's decision in U.S. v. Lee, 455 U.S. 252 (1982) is particularly instructive. In Lee, a member of the Amish community argued that he had a right under the Free Exercise Clause not to contribute to the Social Security system because it substantially burdened his religious beliefs. The Court rejected this argument and found the governmental interest to be compelling. The Court reasoned that because the Social Security system covers numerous religious groups, it would be impractical to custom-tailor the law to account for the religious preferences of each and every specific group. Id. at 258–60.

The reasoning of the Supreme Court in Lee applies to the bankruptcy context. Even small bankruptcies can involve numerous classes of creditors, and it is impractical to treat particular

classes differently based on their religious views. Furthermore, as discussed previously, the government has a compelling interest in avoiding the Establishment Clause violation that would occur if the court outsourced its function to a religious tribunal.

Finally, evidence of bankruptcy as a compelling interest is found in the Constitution's specific reservation to the federal Congress to establish *uniform* bankruptcy laws. U.S. Const. Art. I, § 8, cl. 4 (emphasis added). This is far from a coincidence, given the lead role played by the colonial merchant class in fomenting the American Revolution. Arthur Meier Schlesinger, The Colonial Merchants and the American Revolution (Beard Books 2001) (1918). As James Madison put it, "[t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." The Federalist No. 42, at 271. Accordingly, the court finds the governmental interest in bankruptcy to be compelling.

The court also finds that this bankruptcy proceeding is the least restrictive means of promoting the government's interest. To participate in this bankruptcy case, all most Amish creditors need to do is file a claim.

*B. Arguments Based on 11 U.S.C. § 707(a)*

A chapter 7 debtor does not have an absolute right to dismiss his case. Simon v. Amir (In re Amir), 436 B.R. 1, 16 (B.A.P. 6th Cir. 2010). Rather, the debtor must establish "cause" under 11 U.S.C. § 707(a). The three examples of cause given in section 707(a) are illustrative only, and a court may consider any relevant factor when considering a motion to dismiss for cause. Indus. Ins. Servs. Inc. v. Zick (In re Zick), 931 F.2d 1124, 1126 (6th Cir. 1991). The debtor bears the burden of proving that cause exists for voluntary dismissal. Sicherman v. Cohara (In re Cohara), 324 B.R. 24, 27 (B.A.P. 6th Cir. 2005). The decision to file a chapter 7 bankruptcy is akin to the decision to release a large rock at the top of a steep hill. Once the stasis is broken, and the rock begins to roll, something is required that is far greater than a change of mind.

The Committee argues that this case should be dismissed for cause. The court rejects the Committee's argument for two reasons. First, the court's holding under the Establishment Clause trumps all considerations under section 707(a). Second, after consideration of all relevant facts in this case, the court finds that the debtor has not met his burden of showing cause.

<u>1. The Establishment Clause Trumps Section 707(a).</u>

As discussed above, the Constitution of the United States is the supreme law of the land, and any unconstitutional law is unenforceable. Even assuming the prerequisites for dismissal under section 707(a) are met, the court cannot dismiss this case consistent with the Establishment Clause.

10

### 2. The Debtor has not Shown Cause.

Even if the Alternative Plan was not unconstitutional, the Committee failed to establish cause. The Committee argues that cause to dismiss this case exists for two reasons. First, the Committee argues that bankruptcy is abhorrent to Amish beliefs. The Committee's first reason is legally void. As discussed above, the court cannot dismiss this case based on religious motivation.

Second, the Committee argues that dismissal would be in the best interest of the creditors because of higher creditor distributions due to reduced costs in administration, benevolent funds that would be raised, distribution of the debtor's exempt and post-petition property and the settlement with the Amish Helping Fund. This argument is also unpersuasive. Whether creditors would receive higher distributions under the Alternative Plan is unclear. No evidence was presented by the Committee demonstrating that the financial advantages of the Alternative Plan would more than offset the amount of money that the trustee could collect through avoidance actions. Trustee argued, for instance, that the Amish Helping Fund claim has a value in excess of the proffered payment.

Furthermore, the lack of an automatic stay would make the Alternative Plan unfeasible as a practical matter. It is likely that at least some of Mr. Beachy's numerous creditors would press their claims outside of the Alternative Plan. The net result is likely to be disorder, uncertainty and unequal distribution of estate assets.

Finally, the laws of the United States are not merely utilitarian. More bluntly, we don't abandon the law of the land any time an alternative claims to be profitable. Much of the rule of law and freedom are premised on principles other than efficiency.

### CONCLUSION

The court holds that it cannot delegate this bankruptcy to the Committee consistent with the Establishment Clause and that dismissal in not required by the Free Exercise Clause. Furthermore, the court holds that RFRA is not availing because RFRA is unconstitutional as applied and, alternatively, because the government's interest is compelling and the government's action is narrowly tailored. Finally, the court holds that the Committee has failed to establish cause to dismiss this case pursuant to section 707(a).

Accordingly, the motion to dismiss is denied.

An order will issue with this opinion.

    #    #    #

## Service List:

Monroe L Beachy
3451 Township Rd. 162
Sugarcreek, OH 44681

Anne Piero Silagy, Esq
Canton
220 Market Ave S
#900
Canton, OH 44702

Peter Morrison
Squire, Sanders and Dempsey (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114

Sherri Lynn Dahl
Squire, Sanders & Dempsey (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114

Bruce R Schrader, II
Roetzel & Andress
222 S Main St
Suite 400
Akron, OH 44308

Michael J. Carey
Roetzel & Andress
222 South Main Street
Akron, OH 44038

Sonia Chae
U.S. Securities and Exchange Commission
175 W. W. Jackson Blvd., Suite 900
Chicago, IL 60604

Brian D. Fagel
U.S. Securities and Exchange Commission
175 W. W. Jackson Blvd., Suite 900
Chicago, IL 60604

Maria D. Giannirakis ust06
Office of the US Trustee
H.M. Metzenbaum U.S. Courthouse
201 Superior Avenue East
Suite 441
Cleveland, OH 44114-1240

Robert S. Thomas
One South Main St., 2nd Floor
Akron, OH 44308

Brian J. Malone
One South Main St., 2nd Floor
Akron, OH 44308

Michelle L. BiBartolo
One South Main St., 2nd Floor
Akron, OH 44308

EXHIBIT A

# A & M - A Plain Community Alternative Plan

## Organization Flow Chart



Drn. by DSL 10-4-10

1  4274.08 

# Letter of Support

RE: Monroe L. Beachy - A&M Investments Insolvency

I, the undersigned, am an investor in A&M Investments, and a member of the Plain Community or support its way of life.

I am aware that my investment in A&M Investments has become the subject of a bankruptcy proceeding.

I take strong exception to my investment in A&M Investments being made the subject of a bankruptcy proceeding, because my participation as a creditor is abhorrent to deeply held spiritual principles on which my family and I have based our way of life.

In addition, I am aware that the debtor in the bankruptcy proceeding to which my investment in A&M is now subject, Mr. Monroe L. Beachy, is in the process of requesting that the Honorable Russ Kendig, U.S. Bankruptcy Judge for the Northern District of Ohio, dismiss the bankruptcy that Mr. Beachy filed in the first place.

Finally, I am also aware that Amish Church leadership is developing a Plain Community Alternative to the Monroe Beachy Bankruptcy that would distribute assets of the A&M Investments insolvency - but that it would do so in a manner in which I can engage fully, without violating my basic beliefs by having to file bankruptcy claim documentation and otherwise participate without constraints upon my conscience in the matters relating to my recovery on this investment that is now at risk.

I hereby authorize Amish Church leadership seeking the dismissal of this bankruptcy proceeding to tell the Court, as well as the bankruptcy trustee and all other interested parties that I - speaking as a creditor who is a member of the Plain Community or support its way of life - respectfully submit that the Plain Community Alternative would better accommodate my spiritual convictions and financial needs simultaneously.

Name _____  Date _____

Address _____

City _____

State _____ Zip Code _____

Telephone (optional) _____

Parent of minor child _____


EXHIBIT C

_____Creditor Number

# A&M Standstill Agreement

1. I am a creditor of Monroe L. Beachy (A&M Investments) and believe I am owed approximately $_____.

2. I am opposed to the bankruptcy continuing, my involuntary participation in it as a creditor, and believe the Amish Alternative Plan better protects me as a creditor on both economic as well as on moral grounds.

3. I have read the Amish Alternative Plan as submitted to the Court on 11/22/2010 and support the Plan and the Motion to Dismiss the bankruptcy. I am doing this having been explained it to my satisfaction and I am entering into this agreement out of my own choice.

4. I realize that I am giving up the established process of a bankruptcy process, which includes, for example, <u>using the court system</u> to pursue hidden assets and fraudulent activity, and decide creditor disputes.

5. I am agreeing to have the A&M Trustee Committee implement the Amish Alternative Plan.

6. Specifically, I am satisfied with the Committee's commitment that the net proceeds of the debtor's liquidated assets (approximately $16.5 million less any tax liabilities due, costs of bankruptcy administration, etc.) will be put directly in a bank under the direction of a bank trustee and being distributed to all creditors, equitably and in the same way (regardless of religious affiliation). I understand and agree that from the liquidated assets, certain monies will need to be deducted for both possible tax obligations and to pay legitimate expenses incurred in the bankruptcy process to date.

7. I also agree to release all parties (debtor, other creditors, bankruptcy trustee, other government authorities, A&M Trustee Committee, etc.) from any sort of litigation and am willing to sign a Court recommended acknowledgment to that effect.

8. By signing this document, I acknowledge that I understand I have the right to legal counsel and may be foregoing that right as well as other legal rights that I may have. I further understand and acknowledge by signature below that the attorneys representing the A&M Trustee Committee are not my counsel and have not been retained to represent me or my interests.

9. I also agree to the process to resolve creditor disputes through arbitration by the Amish leadership as described in the Plan.

10. I understand that if there are any material changes to the Amish Alternative Plan as already submitted to the Court, I will have the opportunity to either: a) consent and agree in writing to the final version of the Amish Alternative Plan or b) withhold it. (The signed consent and agreement will be filed with the Court.)

Creditor's signature (or if creditor is minor, adult signing on behalf)

_____

Creditor Name_____

Witness_____

Date Signed _____

(If signing on behalf of minor, adult's name_____
Relationship to Creditor_____
Creditor name and address:

*[signatures]*

Wayne H. Wengerd     Roman Beachy, JR     Emery E. Miller

*Exhibit 1 to Affidavit*



*{Excerpt from A&M Trustee Committee's Memorandum in Support of Dismissal – pp. 14-18'}*

## AMISH ALTERNATIVE PLAN TO BANKRUPTCY

The A&M Trustee Committee has diligently and tirelessly worked to derive an Amish Alternative Plan to these bankruptcy proceedings. The Amish Alternative Plan is proposed to perform the remaining administrative tasks of the Bankruptcy Trustee in a manner consistent with the practices of the Amish faith. The efforts of the A&M Trustee Committee have been done and would continue to be done without compensation.

Further, the Amish Church has raised funds to compensate those advisors of the A&M Trustee Committee in hopes of showing this Court how these Bankruptcy proceedings have and would continue to substantially interfere with their practice of faith.

i. *Commercial & Savings Bank Trust*

The Amish Alternative Plan envisions that upon dismissal of this matter, the handling of the assets currently in the Bankruptcy Estate together with additional assets of Mr. Beachy would be held in Trust with a lending institution as Trustee.

The Trust & Investment Services division of Commercial & Savings Bank of Millersburg Ohio is a bank chartered by the State of Ohio, is a member of the Federal Reserve System, and deposits are insured to the maximum allowed by law under the Federal Reserve Board and the Ohio Division of Financial Institutions.

Thomas S. Rumbaugh is the Vice President and Trust Officer of the bank and has indicated the Bank's willingness to accept the tasks of administration though the Bank's Trust Department. A copy of correspondence indicating same together with the Bank's general Trust & Investment Services Agreement is attached hereto as Exhibit B.

---

' The Flow Chart detailing the connection of the various committees and advisors for specific functions relating to the Alternative Plan was attached to the Memorandum in Support and is also attached hereto as Exhibit A for reference.

Upon dismissal, the Court would order any and all funds currently held by the Bankruptcy Trustee to be paid as follows: (1) to the Court for any outstanding costs; (2) to the Bankruptcy Trustee in compensation for the administration of the Bankruptcy Estate together with costs of the administration through the date of dismissal; (3) balance remaining to the Bank.

Also upon dismissal, the Court would discharge the Bankruptcy Trustee from any further duties of administration and the case could then be closed.

### ii. *Verification of Claims*

All Creditors would be required to provide the Bank with sufficient documentation indicating the balance owed and how that balance was determined. Any Creditors who have filed Proof of Claims with the Bankruptcy Court prior to dismissal would be deemed accepted by the Bank as filed. Counsel for A&M Trustee Committee would be responsible for remitting said Claims and any supportive documentation filed therewith to the Bank.

In the event that required supportive documentation could not be provided and/or a dispute may arise in relation to claims already filed, such disputes would be handled in the manner described herein for disputed claims.

### iii. *Monroe Beachy's Assignment of Assets to Bank for Administration*

In conformity with Amish belief, Mr. Beachy would surrender and/or otherwise assign any and all interests he has in any property to the A&M Trustee Committee for liquidation. Upon liquidation, 100% of revenue would be remitted to the Bank for distribution.

Should Mr. Beachy currently possess any liquid property, said property shall be directly assigned to the Bank for distribution.

### iv. *Distribution to Creditors*

Creditors would receive a pro-rata share of any and all funds held at the Bank. It is estimated that these Creditors would receive approximately 40% of their claims.

### v. *Creditor Disputes*

Prior to any distribution to creditors, all creditor claims would be verified by the A&M Trustee Committee-Creditor Sub-Committee with written acknowledgement by each creditor. Any disputes would be forensically reviewed by Troyer & Associates, 558 Edelweiss Drive NE, Sugarcreek, OH 44681, and arbitrated by the Creditor Sub-Committee.

Any disputes that arise and require further resolution would be dealt with on a case by case basis through mediation provided at no cost by the Creditor Sub-Committee to reach a resolution regarding payment on the claim.

### vi. *Letters in Support of Amish Alternative Plan*

The A&M Trustee Committee sent out correspondence to all of Monroe Beachy's creditors inquiring whether said creditors are in favor of an Amish Alternative Plan to the bankruptcy proceeding. The A&M Trustee Committee has received approximately 2,320 in return in support of the Amish Alternative Plan. [2]

## B. BANKRUPTCY ADMINISTRATION IS INEQUITABLE

### i. *Costs of Administration – Bankruptcy vs. Alternative Plan*

The A&M Trustee Committee envisions that outside of any administration fees payable to the Bank as part of the Trust contemplated above, and any payments required to be paid to any taxing authority, there will be no other administrative costs. The committees established by the Amish Church would perform all the tasks necessary to carry out the Alternative Plan at no

---

[2] Due to the voluminous nature of these documents, the A&M Trustee Committee will request Court approval to file copies in person with the Clerk.

charge to the creditors for their services. Any costs of administration will be paid for by the Amish Church and funds have already been received for this purpose.

Due to the increasing professional costs and fees being accrued in this Bankruptcy Case that will not continue to be incurred by the Amish Alternative Plan, more funds will be available for distribution to creditors.

### ii. Additional Benevolent Funds

In addition to the liquid funds being paid through the Amish Alternative Plan, the Amish Church and the Plain Community have come together to raise additional Benevolent Funds that will also be administered to Creditors of Monroe Beachy in addition to the pro rata distribution described above.

Because these additional funds are not funds of Mr. Beachy, all of the benevolent funds that would be distributed would not be available to Creditors but for the efforts of the Amish Church. These additional benevolent funds will be distributed on a needs basis.

The A&M Trustee Committee would propose an additional deadline for all Creditors of Mr. Beachy (both from the Plain Community and those who are not) to file a request for benevolent funds with the Committee.

The Committee would review each claim on a case by case basis to determine if any need exists, and if so, how much of the monies available in the Benevolent Fund could be distributed to each Creditor. Because these additional funds were a result of the efforts and the solidarity of the people of the Plain Community, the determination of which creditors receive benevolent funds and how much of said funds would remain in the sole discretion of the Amish Church and its appointed committees.